FREDERIC H. GREENBERG *vs.* SUZANNE GREENBERG.

No. 05-P-1742.

Middlesex. October 11, 2006. - February 28, 2007.

Present: DUFFLY, BERRY, & MILLS, JJ.

*Divorce and Separation,* Alimony, Modification of judgment.

In an action to modify a judgment for alimony, the petitioner failed to demonstrate that his impending retirement constituted a sufficient change in circumstances to warrant modifying his alimony payments to his former wife, where unchallenged evidence established that the petitioner had the ability to meet his alimony obligations from income generated by his retirement assets or out of investment assets, without affecting his own standard of living, and where the former wife's expenses and income remained unchanged. [347-353]

A judgment of modification did not supersede a provision in an earlier divorce judgment that provided for continuation of alimony until the death of one of the parties or until the former wife's remarriage. [353]

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on July 24, 1992.

A complaint for modification, filed on April 14, 2004, was heard by *William F. McSweeny, III,* J.

*Joseph J. Brodigan* for Suzanne Greenberg.

*Anthony M. Doniger* (*Shireen G. Arani* with him) for Frederic H. Greenberg.

DUFFLY, J. Anticipating his retirement, Frederic H. Greenberg (Frederic) filed a modification complaint seeking to terminate alimony payments to Suzanne Greenberg (Suzanne), his former wife. A judge of the Probate and Family Court reduced Frederic's alimony payments from $1,050 to $400 per week. We conclude that, in the circumstances of this case, Frederic's retirement was not a sufficient change in circumstances to warrant modification, and we reverse the judgment.

*Procedural background.* After a marriage of twenty-four

years, during which three children were born, Suzanne and Frederic were divorced by a judgment nisi that entered following trial, on December 14, 1994.[1] Among other things, the divorce judgment ordered Frederic to pay to Suzanne (eight years his junior and a full-time homemaker throughout most of the marriage) alimony and child support totaling $2,200 per week. Alimony in the amount of $1,500 per week was to continue "for so long as both [Frederic] and [Suzanne] are alive . . . . The alimony payments shall terminate upon the death or remarriage of [Suzanne], or the death of [Frederic]." The judgment makes no provision for cost of living increases. Child support was subject to specified downward adjustments as each child became emancipated. See note 1, *supra.* The parties were to share equally the cost of the children's private school and college costs not covered by other sources, and the children's uninsured medical expenses (after the first $100 per year, for which Suzanne would be responsible).

Four years later, in February, 1999, Frederic sought a modification of his support obligations, alleging that his "earned income and rental income ha[d] decreased by approximately $80,000.00 per year."[2] By agreement of the parties, in September, 2000, the divorce judgment was modified and alimony reduced to $1,050 per week.

The modification action that is the subject of this appeal was

---

[1]The judgment was amended on January 10, 1995, on joint motion of the parties, to reflect that Frederic's child support payments to Suzanne, who had custody, would be reduced from $700 per week to $500 per week upon emancipation of the first child, and to $400 when the second became emancipated. It would terminate altogether when the youngest became emancipated (an event that occurred prior to the end of the trial on this modification complaint).

[2]Frederic claimed that as a further material change in circumstances, the parties' oldest child was emancipated. The modification action was resolved by an agreement of the parties, dated July 27, 2000, that provided that "paragraph 14 [of the judgment relating to alimony] shall remain the same in all respects except alimony is changed from $1,500 per week to $1050 per week effective 7-28-2000"; it was further agreed that Suzanne would make a gift to the parties' daughter of $10,000 in the year 2000 and $10,000 in the year 2001. The divorce judgment was otherwise unchanged. The parties' agreement was, by amended modification judgment dated September 13, 2000, merged in the judgment and does "not survive and have independent legal significance." See *Huddleston* v. *Huddleston,* 51 Mass. App. Ct. 563, 564 n.2 (2001).

commenced by Frederic in April, 2004. He sought by this complaint to terminate his alimony obligation and alleged, as a material change in circumstances, that he would soon be retiring from his medical practice. After a trial, the probate judge made the following findings of fact. Frederic, who had been a physician with a specialty in ophthalmology, retired on August 31, 2004; his retirement "was a result of a confluence of health problems and certain practice problems." Since retiring, "Frederic's income as proffered by his financial statement . . . shows [weekly] income from the following sources: a. Dividends and interest $322.00[;] b. Social security $416.00[;] c. Rental income $580.00[;] d. Miscellaneous $29.00[;] TOTAL $1,347.00." The parties' three children are now emancipated, the youngest graduated from college in May, 2005 (during the trial), and "certain costs for Suzanne have been reduced or eliminated." Suzanne is currently employed as an administrative assistant at Newton Wellesley Hospital, earning $830 per week; she has investment income in the amount of $206 per week.[3] The judge found that Suzanne could not presently access her retirement funds but that Frederic could access his retirement funds.[4]

The judge concluded that Frederic had failed to "demonstrate[] a material change of circumstances sufficient to justify a full termination of alimony" but that his retirement from full-time employment did "constitute a material change in circumstances sufficient to allow for a reduction of his obligation." A modification judgment entered reducing alimony from $1,050 to $400 per week, and Suzanne appealed.

Because we conclude that the modification judgment will not permit Suzanne to meet her needs (as measured by the parties' marital standard of living), and because Frederic is able to meet

---

[3]The judge also included in Suzanne's income weekly child support the sum of $250, a number drawn from her financial statements. According to the judgment of divorce, as amended, the amount of the weekly child support obligation was $400, see note 1, *supra*; according to Frederic's testimony and financial statements, see note 6, *infra*, he was making child support payments in the amount of $375 per week at the start of trial. Whatever the actual amount being paid, all child support terminated on the youngest child's emancipation during trial.

[4]Frederic reached age sixty-five on October 14, 2004.

his support obligations (established at the time of the last modification judgment) without diminishing his capital assets or affecting his ability to maintain his standard of living, we reverse.

*Discussion.* "To be successful in an action to modify a judgment for alimony . . . , the petitioner must demonstrate a material change of circumstances since the entry of the earlier judgment." *Schuler* v. *Schuler*, 382 Mass. 366, 368 (1981). "In determining whether to modify a support or alimony order, a probate judge must weigh all relevant circumstances." *Id.* at 370. Where a reduction in the alimony is sought, this includes consideration of "the financial status of the support provider, and the station in life of the respective parties," *ibid.*, as well as whether, on all of the economic circumstances, the obligor spouse has "the present ability to pay the amounts required by the agreement and judgment." *Id.* at 375-376. "A substantial and permanent decrease in the income of the support provider is one of the material circumstances to be considered in a request for reduction of a support reward. . . . However, while a substantial decrease in income or financial status may warrant a modification, such a decrease does not alone compel a modification." *Id.* at 370-371. The judge must "keep in mind 'the fundamental purpose of alimony: to provide economic support to the dependent spouse.' " *Katz* v. *Katz*, 55 Mass. App. Ct. 472, 478 (2002), quoting from *Gottsegen* v. *Gottsegen*, 397 Mass. 617, 623 (1986).

A dependent spouse's support needs, whether at the point of initial determination or later, when a modification is sought, are to be "measured by the 'station'' of the parties — by what is required to maintain a standard of living comparable to the one enjoyed during the marriage." *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 819 (1985), and cases cited. See *Cooper* v. *Cooper*, 62 Mass. App. Ct. 130, 138 (2004) (in modification action, judge properly focused on parties' marital lifestyle in assessing wife's current needs). Cf. G. L. c. 208, § 34 (enumerating factors affecting equitable distribution of property and award of alimony on divorce).

We undertake our review in light of the foregoing principles, recognizing that "in fashioning an appropriate modification judgment, the probate judge enjoys considerable discretion, and

the judgment will not be reversed unless it is 'plainly wrong.' . . . This standard is deferential to a judge's decision, but that deference is not without limit." *Cooper, supra* at 134, quoting from *Schuler, supra* at 368. It would constitute an abuse of discretion if findings of fact were not supported by the record or conclusions failed to reflect consideration of applicable legal principles. See *Rosenberg* v. *Merida,* 428 Mass. 182, 189 (1998) (reversal in absence of findings concerning support amount in modification action, "[b]ecause . . . we cannot determine if the judge followed the approach that we have prescribed here"); *Freedman* v. *Freedman,* 49 Mass. App. Ct. 519, 521 (2000) ("[e]rror of law apparent on the record, such as the failure of a judge's findings to support the judge's action," constitutes an abuse of discretion). The "[judge's] reasoning and the basis of his decision[s]" must be apparent in his findings and rulings. See *Trenz* v. *Norwell, ante* 271, 277-278 (2007).

Because unchallenged evidence establishes that Frederic has the ability to meet his alimony obligations from income generated by his retirement assets (which he has chosen not to draw on for the time being) or out of investment assets (which he currently uses to meet his own expenses), without affecting his own standard of living, the fact that he has retired is not a sufficient basis to reduce the alimony award. See *Schuler,* 382 Mass. at 376; *Barron* v. *Barron,* 28 Mass. App. Ct. 755, 759 (1990); *Katz,* 55 Mass. App. Ct. at 481. This is especially true where, as here, "his [former] wife's expenses and income have not changed." *Schuler, supra* at 372.

1. *Frederic's financial circumstances.* The judge made no finding as to the value of Frederic's assets or the potential income to be derived from his substantial retirement funds, and we therefore cannot say that the judge gave appropriate consideration to this important factor in deciding as he did. The parties are in agreement that Frederic's assets at the time of the present modification trial included nearly $2 million in retirement accounts and just under $900,000 in cash and investment accounts; the total value of all his assets was $3,135,182, including an office condominium allocated to him by the divorce judgment. It is also not disputed that since the prior modification in 2000, Frederic's retirement accounts have appreciated,

without additional contribution from him, at an average annual rate of twelve per cent per year. Frederic testified that he has elected not to draw on his retirement funds (all currently invested in various individual retirement accounts) to supplement his weekly income of $1,347 and that he intended to do so but had not decided when or in what amounts.[5] The judge found that Frederic was currently able to draw upon his retirement. Frederic's expenses (exclusive of alimony, child support, and education costs) are about $1,365 per week.[6] He lists no liabilities. In reducing alimony, the judge makes no finding that the $1,050 weekly alimony payment cannot be met without depleting (or even diminishing) Frederic's assets or adversely affecting his standard of living, and nothing in the evidence would support such a finding.[7]

It is also relevant as part of an over-all assessment of the par-

---

[5]To questions on cross-examination regarding his retirement, Frederic responded:

*Q*:  "Do you intend on taking anything out of those retirement vehicles, Doctor, at any time post-retirement, after retirement?"

*A*:  "I intend to at some point."

*Q*:  "Have you made a decision, Doctor, as to how much you would be taking out?"

*A*:  "I have not."

     ". . .

*Q*:  "When, Doctor, are you going to start taking some of the income or appreciation from your [individual retirement accounts]?"

*A*:  "I don't know."

Pressed to answer why he had not made the decision as to when he would begin to access retirement funds, Frederic answered: "I have no need to make a decision yet at this time. . . . I have enough money in the bank for now."

[6]Frederic's expenses are set forth on financial statements submitted during the proceedings. While unchallenged, mistakes in the entries are apparent. On one form, consistent with Frederic's testimony, "$375.00" is inserted as the amount of weekly child support; on others "$0.00" is inserted and "$375.00" appears on the line above (for cable television); on another, "$375.00" is inserted (for the first time) as the weekly amount for vacation.

[7]Nor does the judge's stated rationale reflect a sufficient basis for the reduction:

"The reason that the Court will not terminate the obligation rests primarily in the age disparity between the parties, the fact that . . . Su-

ties' financial circumstances that, when alimony was reduced in 2000, Suzanne commenced full-time employment and incurred mortgage loans in excess of $250,000 in order to meet her needs and those of the children. At the same time that Frederic was paying $23,400 less in annual alimony (as well as reduced child support as the children became emancipated), his income in each of the three years following entry of the 2000 modification judgment was, on average, well over $100,000 per year more than it was when he sought a reduction in his support obligations. Cf. *Huddleston* v. *Huddleston*, 51 Mass. App. Ct. 563, 565 (2001) (proper to increase alimony where findings reflected that husband's income immediately following divorce far exceeded $80,000 in annual earnings he anticipated earning as result of "reduced pace").[8]

It was, as we have said, Frederic's burden to establish that a material change in his circumstances prevented him from meeting his current alimony obligations out of income and assets. See *Schuler*, 382 Mass. at 368. There was unchallenged evidence that his individual retirement accounts had been appreciating at the rate of some twelve per cent per year for the past four years. At one-half that rate, the interest income from

zanne cannot access her retirement assets for some years, and the income which Frederic might even most conservatively be drawing upon at the present time.

"The Court is keenly aware of both of Frederic's positions regarding the retirement assets: First, that the assets were divided at the time of the divorce and, secondly, that because she is younger Suzanne will have more time to accrue future retirement assets. However, the issue before the Court relates to the present change in circumstances and not some hypothetical future event."

[8]The impact of the prior reduction in alimony on Frederic's current economic health is reflected in the fact that, by the time of the current modification action, he had no debts, whereas at the time of the 2000 modification he had over $80,000 in liabilities. His liquid assets significantly increased in value during this time frame: nonretirement cash and investments increased by more than $200,000 (from a value of $744,674 in 2000 to a high of $957,024), and retirement assets increased by nearly $700,000 (from $1,254,265 in 2000, to $1,952,067 in 2005). Increases in the value of Suzanne's liquid assets were modest in comparison. Her cash and nonretirement investments increased by less than $60,000 (from $616,353 to $675,499); retirement assets increased by less than $43,000 (from $1,498,750 in 2000 to $1,541,689 at the time of the within modification action).

his retirement accounts would be in excess of $2,000 per week. The ineluctable conclusion to be drawn from these facts, as well as from evidence of the value of Frederic's other assets, is that Frederic has sufficient financial resources to meet his alimony obligations in the amount of $1,050 per week, as well as his own needs.[9] See *Pagar* v. *Pagar,* 9 Mass. App. Ct. 1, 7 (1980), quoting from *Kay* v. *Kay,* 37 N.Y.2d 632, 636 (1975) ("[A]s to alimony . . . , if it were necessary for the husband here to utilize his capital or other assets, they would not be exempt from the requirement that he maintain the marital standard of living simply because he voluntarily maintains his finances in a form that limits the income they produce"). See also *Binder* v. *Binder,* 7 Mass. App. Ct. 751, 755 (1979) (no changed circumstances where wife's needs and husband's income unchanged, taking into account direct and indirect compensation as well as increased net worth); *Wolfe* v. *Wolfe,* 21 Mass. App. Ct. 254, 257 (1985) ("probate judge need not undertake to direct specifically what the source of the ordered payments shall be").

2. *Suzanne's financial circumstances.* Suzanne's needs have not materially altered since the entry of the earlier modification judgment. Although the judge found that "certain" of Suzanne's expenses would be reduced now that the youngest was emancipated, he did not find by how much. Frederic did not challenge evidence that Suzanne's current weekly expenses, exclusive of child-related costs, are $2,622 per week (including $99 in deductions from income for medical, dental, disability, and life insurance costs). At the time of the 2000 modification, when two children were not yet emancipated, Suzanne's expenses were $2,428 per week; child-related expenses added $502.

Nor has Suzanne's income increased materially. In 2000, she was earning $304 per week working part time as an assistant curator; with interest income, child support, and alimony, her total weekly income was $2,712. At the time of the trial on this

[9] That Frederic's expenses are currently less than Suzanne's does not affect our outcome; Frederic is not required to spend less, and in light of the income generated by his retirement accounts, he could meet his $1,050 weekly alimony obligations while increasing his own expenses by at least $1,000.

modification complaint, Suzanne was earning $830 per week (from which was deducted $402 for tax withholding; medical, dental and life insurance; and similar deductions) from full-time employment as an administrative assistant; she had $206 in interest income. With alimony reduced to $400 per week, and no child support, the gap between Suzanne's available income and expenses is $1,186 per week, or $61,672 per year.

The judge made no finding (nor could he) that Suzanne's current expenses are inconsistent with the standard of living the parties enjoyed during the marriage.[10] That standard includes the real estate, capital assets, and pensions allocated to each party in the divorce judgment (and from which, according to findings issued by the judge presiding over the divorce, the wife could expect to derive income). Twelve years ago, at the time of the divorce, the $2,200 weekly support award plus investment income permitted Suzanne to meet her needs without depleting her assets or seeking employment.[11] Nothing in the parties' current, over-all financial circumstances supports a conclusion that Suzanne can now meet her current needs (as defined by the marital standard of living) without depleting as-

---

[10]We have exercised discretion and obtained a copy of the findings of fact issued in support of the divorce judgment, which was not included in the record appendix. These findings reflect that during the marriage, "[t]he husband and wife lived an upper middle class station in life. They had a nice home in Newton. They scheduled one vacation trip per year to such places as Greece, England, Mexico, Disney World, [and] white water rafting in Colorado. They ate out four to five times per month. The children are all attending private schools." The judge found that Suzanne's "reasonable needs can be met on the combination of child support and alimony provided for in the judgment." In *Greenberg* v. *Greenberg*, 41 Mass. App. Ct. 1101 (1996), an unpublished memorandum and order issued pursuant to our rule 1:28, we affirmed the divorce judgment and held that the judge, in making financial allocations under G. L. c. 208, § 34 (the "core elements" of which included alimony, child support, and the allocation to the wife of $300,000 in capital assets and one-half of the value of the husband's pension and profit sharing plan) "took into account the earning capacity and health of the parties, the school and college expenses of their three children, and the standard of life the couple maintained while married."

[11]There is no evidence that Suzanne acquired assets in addition to those derived from the original disposition at the time of divorce. Frederic testified that he made no contributions to his retirement accounts since 2000; whether he did so prior to that date is not in evidence. Suzanne still lives in the former marital home (which has substantially increased in value; the current net equity totals $827,397), and continues to use the income from investments (currently valued at $670,652) to meet expenses.

sets allocated to her as part of the divorce judgment or reducing her standard of living.

There is also no finding, nor evidence to suggest, that Suzanne will be able to earn more than she does currently. "She shares with the husband the limitations age places upon one's ability to continue to earn income. What future security which is available to her from her assets will quickly be lost when her alimony ends." *Barron* v. *Barron*, 28 Mass. App. Ct. at 759. The judgment requires that the $75,452 annual shortfall be made up, at least until Suzanne retires, by resort to her assets; this will likely deplete her cash and investment accounts and reduce the value of her retirement accounts.

A reduction in alimony is not justified by the finding that Suzanne now earns $830 per week from employment. That income will be available to her at some point from her retirement accounts is not a permissible basis upon which to make the present modification in the circumstances of this case.

3. *Other issues.* We disagree with Frederic that the modification in 2000 supersedes the provision in the divorce judgment that provides for continuation of alimony until Frederic's death, Suzanne's death, or her remarriage. All that was modified was the amount of the alimony obligation. Based on that modification judgment, and because Suzanne did not here seek an increase (either to account for inflation or to resume prior levels of alimony when Frederic's income increased), the sole issue at the trial on the within complaint was whether a further reduction in alimony was warranted because of material changes in the parties' circumstances occurring since the prior modification judgment. As our earlier discussion of relevant cases indicates, measuring a change in the parties' circumstances since the prior judgment does not take place in a vacuum, but occurs against the backdrop of the parties' station in life when married.

*Conclusion.* Neither the findings nor the uncontroverted evidence support the conclusion that there was a change in the parties' circumstances justifying a downward modification in Frederic's alimony obligation. Frederic's request for double costs and attorney's fees related to this appeal is denied.

*Judgment reversed.*